IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION

UNITED STATES OF AMERICA,    *

    Plaintiff,    *

vs.    *    CASE NO. 3:07-CV-25(CDL)

MARION SHERRILL and DORTHEA    *
SHERRILL,
    *
    Defendants.
    *

O R D E R

Plaintiff United States of America filed this action against Defendants Marion Sherrill and Dorthea Sherrill to set aside fraudulent transfers pursuant to the Federal Debt Collection Procedures Act ("FDCPA"), 28 U.S.C. § 3001, *et seq.*  On May 4, 2009, the Court held a non-jury trial.  The Court, after carefully considering all of the evidence, finds in favor of Plaintiff based upon the following Findings of Fact and Conclusions of Law.

FINDINGS OF FACT

**I.   Defendant Marion Sherrill's Violations of Federal Regulations**

Defendant Marion Sherrill ("Marion") was a registered representative of J.P. Turner & Company ("J.P. Turner"), a broker-dealer which was registered with the United States Securities and Exchange Commission ("SEC").  (Trial Ex. A, Stipulated Facts ¶ 1 [hereinafter Stipulated Facts].)  On or about January 20, 2005, Caneka Webb Hardon, a Staff Accountant in the Atlanta, Georgia

1

Regional Office ("ARO") of the SEC, received a complaint from one of Marion's customers regarding possible violations of federal securities regulations. (*Id.* ¶ 2.) After receiving the customer complaint, Hardon reviewed the public records, which revealed that Marion was a recidivist subject to two prior SEC actions. In the first action, which occurred in August 1995, the SEC accused Marion of aiding and abetting a broker-dealer's violations of net capital requirements. As a result of this action, Marion was suspended from associating with any broker or dealer for four months. In the second action, the SEC accused Marion of negotiating an agreement in November 2003 that provided for an issuer of securities to compensate the broker-dealer with whom Marion was employed for the broker-dealer's recommendation of the issuer's securities in violation of SEC regulations. (*Id.*)

With this background, Hardon and Howard Dennis, Jr., an ARO Assistant Regional Director, met and interviewed Marion on January 26, 2005 about the possible misappropriation of client funds. (*Id.* ¶ 3.) The following day, SEC personnel returned to Marion's office and reviewed hundreds of Marion's cancelled checks. (*Id.* ¶ 4.) The investigation revealed that Marion had received approximately $400,000 from approximately eighteen clients for his personal use. Marion contends that the transactions were loans where he executed promissory notes payable to his clients with an interest rate that

2

was greater than the return they were making in the market.  (Pl.'s Ex. 34a.)

Based on the investigation and the discovered SEC violations, the SEC filed a civil action against Marion on February 9, 2005 in the Northern District of Georgia.  (Stipulated Facts ¶ 5.)  On May 26, 2006, a final judgment was entered against Marion in the amount of $423,513.  (*Id.* ¶ 6.)  On August 2, 2005, a criminal indictment in *United States v. Marion Sherrill* was filed in the Northern District of Georgia.  (*Id.* ¶ 7.)  The criminal action was based on the same facts that gave rise to the SEC civil action.  The Government sought restitution in the criminal action.  The civil judgment would be reduced by the amount of restitution ordered in the criminal case.  (*Id.* ¶¶ 6, 8.)  The indictment charged Marion with mail fraud, securities fraud, and obstruction of justice.  (*Id.* ¶ 8.)  On March 31, 2006, Marion pled guilty to one count of obstruction of justice, and on June 6, 2006, Marion was sentenced to fourteen months imprisonment and was ordered to pay restitution in the amount of $393,955.75.  (*Id.* ¶¶ 9-10.)  As of April 2, 2009, the outstanding balance on Marion's criminal debt was $442,758.17 and as of the same date, Marion had paid $7,175 of the restitution.  (*Id.* ¶ 11.)

## II.  Marion's Transfer of the Stock Gap Property to his Wife

On January 26, 2005 and for the preceding twenty years, Marion and his wife, Dorthea Sherrill ("Dorthea"), resided at 410 Stock Gap Road, Monroe Georgia 30656 ("Stock Gap").  (Stipulated Facts ¶ 12.)

They jointly owned that property and were joint obligors on mortgages that were secured by the property. (*Id.* ¶¶ 15-16.) The property included their home, a two acre lake and twenty one additional acres. (*Id.* ¶ 14.) For the duration of the Sherrills' marriage, Marion was the sole wage-earner and Dorthea did not contribute regular income to the household. (*Id.* ¶ 13.)

On January 27, 2005, one day after Hardon and Dennis interviewed Marion about potential SEC violations, a quitclaim deed was filed conveying all of Marion's title and interest in the Stock Gap property to his wife. (*Id.* ¶ 17.) The quitclaim deed, drafted by attorney Stephen Noel, indicated that the property conveyance was a Deed of Gift; specifically, the property was transferred "in consideration of Ten Dollars ($10.00), love and affection and other good and valuable consideration." (*Id.* ¶¶ 18, 19; *see* Pl.'s Ex. 9.) Dorthea did not pay Marion any money for his transfer of his interest in the Stock Gap property to her. (Stipulated Facts ¶ 20.) Marion did not recall whether he told his wife on January 26, 2005 that he had signed the quitclaim deed and transferred the property to her. (*Id.* ¶ 21.) It is undisputed that Marion was insolvent both before and after he conveyed the Stock Gap property to his wife and that he was unable to pay his debts as they came due.

Marion estimated that the fair market value of the Stock Gap property at the time of the transfer was $273,623 (*see* Pl.'s Ex. 93, Fin. Statement of Debtor 17), and the Court finds this to be the fair

4

market value of the property at the time of transfer.[1]  On the date of the transfer, two secured loans existed on the property-one with Countrywide Mortgage Company in the amount of $188,403 (Pl.'s Ex. 14, Countrywide Home Loans 2), and a second with Guaranty Bank Equity in the amount of $27,162 (Pl.'s Ex. 15, Guaranty Bank Loan Docs. 36), for a total secured debt on the property of $215,565.  Therefore, the fair market value of the equity of the Stock Gap property at the time of transfer was $58,058, with Marion's one-half share equaling $29,029.

## III. Marion's Transfer of the Tanners Bridge Property to his Wife

The other contested transfer of property involves a house and 5.989 acres located at 425 Tanners Bridge Road in Monroe, Georgia 30656 ("Tanners Bridge").  That property was purchased by the Sherrills in 1998 as joint tenants. (Stipulated Facts ¶ 25.)  The Sherrills had borrowed $166,155 as joint obligors in September 1998, which debt was secured by the Tanners Bridge property. (*Id.* ¶ 26.)  Dorthea's son, Randolph Segal, lived in and rented the Tanners Bridge property during several different periods between 1998 and 2005. (*Id.* ¶ 27.)  On or about February 5, 2005, approximately two weeks after the SEC interview, Marion executed a quitclaim deed that

---

[1] *See United States v. 68.94 Acres of Land*, 918 F.2d 389, 397 (3d Cir. 1990) ("The Federal Rules of Evidence generally permit landowners to give opinion evidence as to the value of their land due to the special knowledge of property which is presumed to arise out of ownership."); *LaCombe v. A-T-O, Inc.*, 679 F.2d 431, 433 (5th Cir. 1982) ("[T]he owner of property is qualified by his ownership alone to testify as to its value.").

transferred all of his interest in the Tanners Bridge property to his wife.  The quitclaim deed, drafted by Noel, was filed on February 4, 2005 and was recorded as a Deed of Gift; specifically, the deed purported to transfer his interest in the property "in consideration of Ten Dollars ($10.00), love and affection and other good and valuable consideration." (*Id.* ¶¶ 28, 29; *see* Pl.'s Ex. 25.)  Dorthea did not pay Marion any money for the quitclaim of his interest in the Tanners Bridge property.  (Stipulated Facts ¶ 30.)  It is undisputed that Marion was insolvent both before and after he conveyed the Tanners Bridge property to his wife.  Marion estimated the fair market value of the Tanners Bridge property at the time he transferred it to his wife to be $275,000.  (Pl.'s Ex. 93, Addendum to Fin. Statement of Debtor.)[2]  At the time of the transfer, the outstanding balance on the mortgage secured by the Tanners Bridge property was $152,825 (Pl.'s Ex. 31, Nat'l City Mortgage Co. Loan History 1), thus leaving equity in the Tanners Bridge property of $122,175.  Therefore, the value of the equity interest transferred by Marion was $61,087.50.

---

[2]An appraisal of the Tanners Bridge property, dated May 5, 2005, effective April 5, 2005, provided that the final estimate of value of the property was $275,000.  (Pl.'s Ex. 14, One-Unit Residential Appraisal Field Review Report 4.)  The Court notes that although the appraisal was performed two months after the February 2005 quitclaim, the appraisal took into account the comparable sales of properties that were sold in July 2004 and October 2004.

**IV.  Estate Planning Intentions**

In response to the United States's allegations that the transfers of the Stock Gap and Tanners Bridge properties were fraudulent conveyances, Marion maintains that these transfers were made solely for "estate planning" purposes.  The Court found Marion's testimony at trial on this subject to lack credibility.  Moreover, it was completely contradicted by his own attorney who Marion testified he retained to handle the legal aspects of the purported estate planning transactions.  Specifically, Marion testified that he and attorney Noel, who had drafted the quitclaim deeds, had spoken several times regarding the transfers, and that Marion conveyed to Noel that it was his sole intention to transfer the properties to his wife for estate planning purposes.  Yet, Noel testified that Marion sought to transfer the assets out of his name to avoid potential creditors.   The Court finds as a factual matter that the intent of the transfers was to avoid creditors, not for estate planning.

CONCLUSIONS OF LAW

The Court finds that Marion's transfers of the Stock Gap and Tanners Bridge properties to his wife were fraudulent under 28 U.S.C. § 3304(b)(1)(A) and 28 U.S.C. § 3304(b)(1)(B).  Since many of the factors relevant to each of these two provisions are the same, the Court will address them together in this Order.

**I.   Fraudulent Transfers under § 3304(b)(1)(A) and § 3304(b)(1)(B)**

Section 3304(b)(1)(A) provides, in pertinent part, that

> a transfer[3] made or obligation incurred by a debtor[4] is
> fraudulent as to a debt[5] to the United States, whether such
> debt arises before or after the transfer is made or the
> obligation is incurred, if the debtor makes the transfer
> or incurs the obligation . . . with actual intent to
> hinder, delay, or defraud a creditor[.]

Section 3304(b)(1)(B)(ii) provides, in pertinent part, that

> a transfer made or obligation incurred by a debtor is
> fraudulent as to a debt to the United States, whether such
> debt arises before or after the transfer is made or the
> obligation is incurred, if the debtor makes the transfer
> or incurs the obligation . . . without receiving a
> reasonably equivalent value in exchange for the transfer
> or obligation if the debtor . . . intended to incur, or
> believed or reasonably should have believed that he would
> incur, debts beyond his ability to pay as they became due.

The thrust of § 3304(b)(1)(A) is the intent of the debtor to hinder,

delay, or defraud the United States as creditor, whereas the gravamen

of § 3304(b)(1)(B) is the making of the transfer without receiving

---

[3]Transfer is defined as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance."  28 U.S.C. § 3301(8).

[4]Under 28 U.S.C. § 3002(4), a debtor is defined as "a person who is liable for a debt or against whom there is a claim for a debt."

[5]A debt is defined, in pertinent part, as either:

    (A)  an amount that is owing to the United States on account
         of a direct loan, or loan insured or guaranteed, by the
         United States; or
    (B)  an amount that is owing to the United States on account
         of a fee, duty, lease, rent, service, sale of real or
         personal property, overpayment, fine, assessment, penalty,
         restitution, damages, interest, tax, bail bond forfeiture,
         reimbursement, recovery of a cost incurred by the United
         States, or other source of indebtedness to the United
         States, but that is not owing under the terms of a
         contract originally entered into by only persons other
         than the United States[.]

28 U.S.C. § 3002(3).

a reasonably equivalent value in exchange when the transfer would reasonably be expected to cause the debtor to incur debts beyond his ability to pay them as they become due.

Because of the difficulty of producing direct proof of fraud, circumstantial evidence can be sufficient to establish an intent to defraud. 37 Am. Jur. 2d <u>Fraudulent Conveyances and Transfers</u> § 202 (2009). Therefore, in determining whether actual intent exists in this case, the Court may consider, among other factors, whether:

(A) the transfer or obligation was to an insider;
(B) the debtor retained possession or control of the property transferred after the transfer;
(C) the transfer or obligation was disclosed or concealed;
(D) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
(E) the transfer was of substantially all the debtor's assets;
(F) the debtor absconded;
(G) the debtor removed or concealed assets;
(H) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
(I) the debtor was insolvent[6] or became insolvent shortly after the transfer was made or the obligation was incurred;
(J) the transfer occurred shortly before or shortly after a substantial debt was incurred; and
(K) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

28 U.S.C. § 3304(b)(2). Although § 3304(b)(2) permits the Court to consider other factors, it does not require the Court to do so. *Fed.*

---

[6]Under 28 U.S.C. § 3302(a), a debtor becomes insolvent when "the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation." There is a presumption of insolvency when a debtor generally does not pay its debts as they become due. 28 U.S.C. § 3302(b).

*Trade Comm'n v. Nat'l Bus. Consultants, Inc.*, 376 F.3d 317, 321 n.7 (5th Cir. 2004).  The Court will now analyze the pertinent[7] factors in this case to determine whether Marion acted with the actual intent to defraud the United States, thus making the conveyances fraudulent under § 3304(b)(1)(A).  The Court reiterates that some of these factors are also relevant to whether Marion transferred the properties without receiving fair value in exchange and whether the transfers placed him in a position that made it more difficult for him to pay his debts as they became due, thus making the conveyances fraudulent under § 3304(b)(1)(B).

    A.    Transfer to an Insider

    Under the FDCPA, the definition of an insider includes "a relative of the debtor." 28 U.S.C. § 3301(5)(A)(i).  Marion's transfers of the Stock Gap and Tanners Bridge properties to his wife clearly qualify as transfers to an insider.

    B.    Possession or Control of Properties

    Marion continued to live at the Stock Gap property after he conveyed the property to his wife, and he continued to contribute regular mortgage payments to both properties after the transfers. Therefore, the Court finds that Marion retained a sufficient degree of possession and control of the subject properties after he conveyed

---

    [7]The following factors are irrelevant to the analysis of this case: 28 U.S.C. §§ 3304(b)(2)(C), (F), (G), and (K).  Marion neither concealed the transfers, avoided legal prosecution, removed or concealed assets, nor transferred any assets to a lienor.

them to his wife for this factor to weigh in favor of a finding that the conveyances were fraudulent.

C.    The Threat of Suit

No legal action was brought against Marion before he transferred the properties.  However, the Court finds that sufficient threat of legal action existed at the time of the transfers for this factor to weigh in favor of a finding of a fraudulent conveyance.  At the time of the transfers, Marion knew he was being investigated by the SEC. He also knew that at that time he had several outstanding alleged "loans" to customers which he should have known were at a minimum suspect under SEC regulations.  These "loans" were substantial, and someone with Marion's experience would have known that the SEC, upon finding a violation, had the authority to pursue legal action against him and recover the amounts Marion had obtained from his customers either through disgorgement in a civil action or restitution in a criminal action.  Therefore, the Court finds that at the time Marion made the transfers, he was sufficiently aware of a "threat of suit" such that this factor weighs in favor of a finding of fraudulent intent.

D.    Substantially All of Debtor's Assets

It is undisputed that after the transfers, Marion had no other significant assets.  Therefore, his transfers of the Stock Gap and Tanners Bridge properties to his wife were of substantially all of his assets.  Such a transfer weighs in favor of a finding of

11

fraudulent intent and also supports a finding that the transfer would hinder his ability to pay any of his debts as they became due.

    E.   Value of the Consideration

    Dorthea gave nothing of value for obtaining Marion's interest in the transferred properties.  The fact that the quitclaim deeds indicate that the consideration was for a nominal dollar amount and love and affection does not help Marion's case.  *See Vancampen v. United States*, Nos. Civ.A. 95-1436-FGT, Civ. A. 95-1453-FGT, 1997 WL 873537, at *3 (D. Kan. July 9, 1997) (noting that a one dollar consideration does not constitute "reasonably equivalent value" under the FDCPA); *see also United States v. Moore*, 156 F. Supp. 2d 238, 246 n.2 (D. Conn. 2001) ("Any intangible, emotional benefit is not included within the meaning of reasonable equivalent value because [w]ithin the meaning of the statute, value means economic value." (alteration in original) (internal quotation marks omitted)).  The Court finds that Marion transferred his interest in the subject properties without receiving anything of value in return.  Therefore, this factor weighs in favor of a finding of fraudulent intent for purposes of § 3304(b)(1)(A) as well as a finding supporting a fraudulent conveyance under § 3304(b)(1)(B).

    F.   Insolvency after Transfers

    Marion's liabilities exceeded his assets both before and after the transfers of the subject properties.  Therefore, the Court finds Marion was insolvent after the transfers, a factor that weighs in

12

favor of finding that they were fraudulent under both § 3304(b)(1)(A) and § 3304(b)(1)(B).

G.   The Conveyance of Subject Properties Shortly before Incurrence of Substantial Debt

Marion transferred the Stock Gap property to his wife on January 27, 2005 and he transferred the Tanners Bridge property to his wife on February 5, 2005. (Stipulated Facts ¶¶ 17, 28.) It is undisputed that at the time of the transfers Marion had issued over twenty promissory notes totaling over $400,000 to brokerage customers in violation of federal securities regulations. He knew that SEC investigators were on his trail. Based on his experience, he would have known that once they fully discovered his SEC violations, they were likely to pursue an action against him to seek return of these customers' funds. Therefore, the Court finds that Marion transferred his interest in the subject properties shortly before the incurrence of a substantial debt.

When you combine an analysis of the pertinent factors under § 3304(b)(1)(A) with testimony of Marion's own attorney that he was contemplating ways to avoid potential creditors, it is clear that Marion made the transfers to hinder and delay the United States's collection of the amounts owed by Marion. Accordingly, the Court finds the transfers to be fraudulent conveyances under § 3304(b)(1)(A) and thus subject to be set aside. Additionally, the Court finds that Marion did not receive equivalent value for the transfers and that the transfers further hindered his ability to pay

13

his debts; thus the conveyances are also fraudulent under §
3304(b)(1)(B).

## II.  Remedies

Under 28 U.S.C. § 3306(a), the United States may obtain the
following remedies as a result of a fraudulent transfer: "(1)
avoidance of the transfer or obligation to the extent necessary to
satisfy the debt to the United States; (2) a remedy under this
chapter against the asset transferred or other property of the
transferee; or (3) any other relief the circumstances may require."
If the transfer is voidable under 28 U.S.C. § 3306(a)(1), then the
United States

> may recover judgment for the value of the asset
> transferred, but not to exceed the judgment on a debt. The
> judgment may be entered against-
>
> (1)  the first transferee of the asset or the person
>      for whose benefit the transfer was made; or
> (2)  any subsequent transferee, other than a good
>      faith transferee who took for value or any
>      subsequent transferee of such good-faith
>      transferee.[8]

28 U.S.C. § 3307(b).

The Court finds that the quitclaim deeds from Marion to Dorthea
relating to his transfers of his interest in the Stock Gap and
Tanners Bridge properties shall be set aside.  The Court further
finds that the United States shall be permitted to record a judgment

_____

[8]It is undisputed that Marion received no reasonably equivalent value
for the subject properties; thus, Dorthea did not take for value.
Therefore, the Court finds that Dorthea was not a good faith transferee
who took for value.

14

lien attaching Marion's half interest in the Stock Gap property, and to execute on that lien if necessary. *See* 28 U.S.C. § 3306(a)(1).

The foregoing remedies, however, do not effectively "undo the fraud." Subsequent to the transfers to her, Dorthea obtained additional financing which increased the amount of the encumbrances on the properties. Therefore, Marion's equity in his half interest in the properties has a substantially lower value today after the conveyance is set aside than it had prior to the fraudulent conveyance. The only way to restore the parties to the position they occupied before the fraudulent conveyances were made is to award damages to Plaintiff and against Dorthea equal to the value of Marion's interest in the equity of the properties at the time of the fraudulent conveyances.

Defendants contend that the United States is not entitled to a money judgment against Dorthea because she lacked the requisite intent to defraud. The United States responds that it is entitled to a money judgment against Dorthea irrespective of Dorthea's intent because the transferee's knowledge of fraud or actual intent to defraud is irrelevant under the FDCPA.

Although the Court does not find that Dorthea knew of the reasons for the transfers or had any fraudulent intent regarding them, the Court nevertheless finds that an award of money damages against her is demanded in this case. The Court has located few cases under the FDCPA addressing this precise issue. However, there

15

is substantial analogous authority under the Uniform Fraudulent Transfer Act ("UFTA").[9]   These cases consistently hold that the intent of the transferee is irrelevant in determining whether a money judgment is appropriate.   *See, e.g., Warfield v. Byron*, 436 F.3d 551, 559 (5th Cir. 2006) (recognizing that a transferee's knowing participation in a fraudulent conveyance is irrelevant under Washington's UFTA); *Anderson v. Michaelson*, 127 F. App'x 253, 257 (9th Cir. 2005) (noting that a transferee's intent under Arizona's UFTA is immaterial to setting aside fraudulent transfers to a transferee); *Nat'l Council on Comp. Ins., Inc. v. Caro & Graifman, P.C.*, Civ. No. 3:00-CV-1925(AHN), 2008 WL 450413, at *21 (D. Conn. Feb. 15, 2008) ("Under the [Connecticut] [Fraudulent Transfer Act], the transferee's intent is irrelevant to the statutory finding of an intentional fraudulent transfer[.]" (second alteration in original) (internal quotation marks omitted)); *United States v. Reid*, 127 F. Supp. 2d 1361, 1369 (S.D. Ga. 2000) (concluding that there was no requirement that the United States show any evidence of a transferee's fraudulent intent under O.C.G.A. § 18-2-22(3), which at

---

[9]The Court notes that the relevant provisions of the UFTA enacted by Georgia, *see* O.C.G.A. §§ 18-2-74, -75, -78, contain virtually identical language to the FDCPA, *see* 28 U.S.C. § 3301, *et seq*.

16

the time was the equivalent statute to 28 U.S.C. § 3304(b)(1)(B)).[10]
Therefore, the Court finds that the United States may obtain a money
judgment against Dorthea, notwithstanding the fact that there has
been no evidence submitted to the Court to suggest that Dorothea
possessed the actual intent to defraud, or even knew of Marion's
intent to defraud.[11]

The Court finds that the amount of that money judgment shall be
$90,116.50, which equals the value at the time of the fraudulent
transfers of Marion's one-half equity interest in the Stock Gap
property ($29,029) plus the value of Marion's one-half equity

---

[10]The Court finds Defendants' reliance on *Kesler v. Veal*, 257 Ga. 677,
362 S.E.2d 214 (1987), misplaced.  In *Kesler*, the Georgia Supreme Court
found that a transferee could not be held liable under O.C.G.A. § 18-2-22,
the former Georgia transfer statute, unless there was some "proof of bad
faith, actual fraud, or conspiracy."  *Id.* at 678, 362 S.E.2d at 215.
However, the statute the Georgia Supreme Court analyzed in *Kesler*, *see*
O.C.G.A. § 18-2-22, was repealed in 2002, and in the same year, Georgia's
UFTA, *see* O.C.G.A. §§ 18-2-70 *et seq.*, was enacted. It is noteworthy that
Georgia's UFTA no longer contains language regarding a transferee's
intent.  *See* O.C.G.A. §§ 18-2-74, -75.

[11]Plaintiff contends that there was sufficient evidence admitted at
trial to suggest that Dorthea "knew or should have known of the fraudulent
nature of the conveyance[s]."  (Gov't Post-Trial Br. 6 n.6.)
Specifically, Plaintiff contends that evidence of the close relationship
between Marion and Dorthea, as husband and wife, along with evidence that
Dorthea was present during a conversation Marion had with Noel in December
2004 regarding the purpose of the transfers, was sufficient to support
Plaintiff's contention that Dorthea had the requisite intent.  (*Id.*)  The
Court disagrees.  There was no evidence admitted at trial to suggest that
Dorthea knew that Marion was being investigated for violations of federal
regulations.  More importantly, Dorthea did not testify at trial, and so
the Court is unaware of Dorthea's own knowledge or intent to defraud.
Therefore, the Court does not find that Dorthea had the requisite intent
to defraud or had the requisite knowledge of Marion's actual intent to
defraud.  The Court reiterates, however, that it is likewise clear that
Dorthea was not a good faith transferee for value, and consequently, she
is not protected under those provisions of the statute.

interest in the Tanners Bridge property ($61,087.50). This is the value of property Dorthea received for which she gave no consideration. Therefore, the Court finds such an award of damages is reasonable and necessary to accomplish the setting aside of the two fraudulent conveyances.

CONCLUSION

Based on the foregoing, the Court orders as follows:

1)   the quitclaim deed filed on January 27, 2005 in which Marion Sherrill conveys all of his interest in 410 Stock Gap Road, Monroe, Georgia 30656 to Dorthea Sherrill is set aside;

2)   the quitclaim deed filed on February 5, 2005 in which Marion Sherrill conveys all of his interest in 425 Tanners Bridge Road, Monroe Georgia 30656 to Dorthea Sherrill is set aside;

3)   Plaintiff is authorized to record a judgment lien attaching Marion Sherrill's half interest in the Stock Gap property and to execute on that lien if necessary; and

4)   Damages are awarded in favor of Plaintiff and against Dorthea Sherrill in the principal amount of $90,116.50.[12]

---

[12]Defendant Dorthea Sherrill's motion for judgment as a matter of law is denied for the same reasons that support the Court's Findings of Fact and Conclusions of Law as set forth in this Order.

18

IT IS SO ORDERED, this 27th day of May, 2009.


                                        S/Clay D. Land
                                           CLAY D. LAND
                                    UNITED STATES DISTRICT JUDGE